UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DAMOND GREGORY,<br><br>Plaintiff,<br><br>v.<br><br>RON NEAL, et al.,<br><br>Defendants. | CAUSE NO. 3:24-CV-135-PPS |

OPINION AND ORDER

Damond Gregory, a prisoner without a lawyer, brings two claims related to a fire that occurred at Indiana State Prison ("ISP") on January 14, 2023. First, he is proceeding against Officer Kevin Cross, Lieutenant Nadine Smith-Robinson, Officer Darnell Crockett, Sergeant Jeniene Walton, Lieutenant Dennis Koen, Case Worker Jacqueline Mayes, and Dr. Christina Chico "in their personal capacity for money damages for denying him medical care for injuries he suffered in a January 2023 fire in violation of the Eighth Amendment[.]" ECF 9 at 11. Second, he is proceeding against Commissioner Christina Reagle, Warden Ron Neal, Assistant Warden Dawn Buss, Major Douglas Wardlow, Supervisor of Fire Training Gordon Beecher, and Safety Hazard Manager Deborah Taylor "in their personal capacity for monetary damages for deliberate indifference to the risk of harm posed by a fire that occurred in January 2023 in violation of the Eighth Amendment[.]" *Id.* at 12. For simplicity's sake, I will refer to these collectively as the "state defendants". The state defendants filed a joint motion for summary judgment, which is fully briefed. ECF 116, 117, 124, 125, 132, 133, 136, 143,

144, 154, 155. The remaining defendant, Dr. Chico, filed a separate motion for summary judgment, which is likewise fully briefed. ECF 119, 120, 121, 130, 131, 138.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). I will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). My sole task at this stage of the case is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable factfinder could find in favor of the non-moving party, summary judgment may not be granted. *Id.*

I will address the state defendants' summary judgment motion first and then turn to Dr. Chico's summary judgment motion.

## I. State Defendants

Gregory is proceeding against the state defendants on two claims. First, he is proceeding against one group of state defendants who were physically present for and actively involved in responding to the January 14 fire – Officer Cross, Lt. Smith-Robinson, Officer Crockett, Sgt. Walton, Lt. Koen, and Case Worker Mayes (collectively, the "incident defendants") – for denying him medical care for injuries he suffered during the January 14 fire. ECF 9 at 11. Second, he is proceeding against another group of state defendants who are supervisory officials at ISP – Commissioner Reagle, Warden Neal, Assistant Warden Buss, Major Wardlow, Supervisor of Fire Training Beecher, and Safety Hazard Manager Taylor (collectively, the "supervisory defendants") – for deliberate indifference to the risk of fire at ISP. *Id.* at 12. Each claim will be addressed in turn.

### *a. Incident Defendants*

Gregory is proceeding against the incident defendants for denying him medical care for injuries he suffered during the January 14 fire. Viewed in the light most favorable to Gregory, the evidence shows the following facts:

During all relevant times, Gregory was living in Cell 346, a single-man cell on the third floor of the north side of A Cellhouse (ACH). ECF 117-1 at 13. Around 11:00 a.m. on January 14, 2023, a fire started in cell A252, on the north side of ACH. ECF 96-1 at 22. The individual who lived in cell A252 was Michael Smith. *Id.* Gregory's cell was one floor above and two cells down from Cell A252. ECF 117-1 at 13. Gregory began to see smoke, and started screaming that there was a fire. ECF 117-1 at 19, 32-33.

At around 10:58 a.m., prison staff heard the fire alarm in ACH go off and inmates yelling, prompting them to respond. ECF 117-11 at 2. Sgt. Walton called a 10-71, which is the signal for a fire in ACH. ECF 117-11 at 2; ECF 90 at 5-6. Officer Cross grabbed a fire extinguisher from the officer's station, and he and Officer Crockett went to the 200 North range with the fire extinguisher and the keys to the range. ECF 117-3 at 3; ECF 117-11 at 2. Once they were on the 200 range, they realized the location and size of the fire. *Id.* They proceeded to Cell A252, but it was hard to get near the front of the cell to manually unlock the door because of the intensity of the fire. *Id.* Officer Cross used the fire extinguisher, but it was not able to put out the fire. ECF 117-3 at 3. Officer Cross had unknowingly grabbed a water-based fire extinguisher, and realized he needed an ABC fire extinguisher instead. *Id*.

Officer Cross quickly went back downstairs and met Lt. Smith-Robinson, who handed him an ABC fire extinguisher. ECF 117-3 at 3; ECF 117-4 at 2. At approximately 10:59 a.m., Officer Cross returned to Cell A252 with the ABC fire extinguisher and passed it to Officer Crockett, who deployed it to control the fire. ECF 117-11 at 2; ECF 117-3 at 3. First responders arrived on the scene, including Lt. Koen. ECF 117-11 at 2; ECF 117-5 at 2. Lt. Koen was able to open the door to Cell A252 as staff continued to try to put out the fire. *Id.* The inmate firefighters arrived on the scene and were able to extinguish the fire. ECF 117-11 at 3.

While the fire was ongoing, Gregory placed a towel around his face and leaned over his sink and toilet. ECF 117-1 at 20. He testified that he experienced chest pains, difficulty breathing, lightheadedness, and coughing up "black stuff." *Id.* at 45-46, 50.

Once the inmate firefighters arrived and began extinguishing the fire, Captain McCann authorized the evacuation of the remaining inmates in ACH. ECF 117-4 at 2. Correctional officers unlocked the cells and swept each range. *Id*. Gregory's cell was opened and he was able to go down the stairs to evacuate. ECF 117-1 at 28-29, 45. While he was getting ready to go outside, he informed Case Worker Mayes that he needed medical assistance because his chest was hurting and he could not breathe. *Id.* at 45-46. Case Worker Mayes responded that she was "not the medical person" and directed him to the recreation yard. *Id.* at 46. Case Worker Mayes is the only person Gregory spoke to on the way to the recreation yard. *Id.* at 47. Once he arrived at the recreation yard, he was not able to speak to any of the incident defendants because they were "worried about head count and making sure everybody was placed where they were supposed to be." *Id.* at 48.

After ACH was cleared, the inmates were returned to their cells and placed on lockdown. ECF 117-3 at 4; ECF 117-4 at 2. Lt. Koen and Lt. Smith-Robinson assisted in directing inmates back to their cells. ECF 117-4 at 2; ECF 117-5 at 3. Lt. Koen attests that any inmate who was experiencing a medical emergency was taken straight to the medical services unit, while an inmate who requested medical attention but showed no signs of a medical emergency would first have been secured in his cell before staff began triage, because any treatment would have required coordination with medical staff. ECF 117-5 at 3.

While Gregory was returning to his cell, he told Sgt. Walton that he needed medical treatment. ECF 117-1 at 50. Specifically, he told her that he couldn't breathe,

had black soot in his nose, his chest hurt, and he kept getting lightheaded. *Id.* In response, Sgt. Walton told Gregory, "I'm busy right now." *Id.* Sgt. Walton's focus was to ensure that all inmates were accounted for and to maintain the safety and security of the building. ECF 90 at 11. Gregory also believes he told Lt. Koen that he needed medical attention on the way back to his cell because Lt. Koen was standing at the door. ECF 117-1 at 52. Lt. Koen attests he was assisting with securing inmates back in their cells. ECF 117-5 at 3. Gregory told Lt. Koen he could not breathe and that he was lightheaded, and Lt. Koen told Gregory to go back to his cell. ECF 117-1 at 52-53. Gregory did not have any other conversations with the incident defendants on the way back to his cell because "[t]hey [were] too busy trying to lock everyone down." *Id.* at 51. Sgt. Walton, Case Worker Mayes, and Lt. Koen were the only incident Gregory remembers speaking to about medical attention on January 14. *Id.* at 52.

Once inmates were back in their cells, Lt. Smith-Robinson and other custody staff performed a count of the inmates, did rounds in the cellhouse, spoke with the inmates, and informed medical staff if any of them required assistance. ECF 117-4 at 2-3. After Gregory was returned to his cell, he asked "one of the officers for a medical request form" but he could not recall which officer he asked. ECF 117-1 at 53. He never received a healthcare request form from this unknown officer. *Id.* Gregory could not recall whether he ever asked for medical assistance after the day of the fire. *Id.* at 90. It is unclear from the record whether Gregory ever received any medical treatment for his symptoms related to the January 14 fire.

As discussed, Gregory is proceeding against the incident defendants "for denying him medical care for injuries he suffered" during the January 14 fire. ECF 9 at 11. The incident defendants argue summary judgment is warranted in their favor on this claim because (1) Gregory did not suffer any objectively serious medical condition, (2) they were not deliberately indifferent to that condition, and (3) they are entitled to qualified immunity.

Under the Eighth Amendment, prison officials have a duty to ensure inmates receive constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability for an Eighth Amendment violation, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendants acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the second prong, Gregory must show the incident defendants "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks, brackets, and citations omitted). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)). The deliberate-indifference inquiry is subjective: the defendant must be aware of facts supporting an inference that a substantial risk of serious harm exists and

must actually draw that inference. See *Farmer*, 511 U.S. at 837; *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024). Accordingly, for Gregory to survive summary judgment, the evidence must permit a reasonable jury to find that each incident defendant knew he faced a serious medical risk and consciously disregarded it.

The evidence does not permit that finding as to Officer Cross, Officer Crockett, or Lt. Smith-Robinson. Gregory testified that Case Worker Mayes, Sgt. Walton, and Lt. Koen were the only incident defendants he remembered speaking to about medical attention on January 14. ECF 117-1 at 47, 52. After he returned to his cell, he asked an unidentified officer for a healthcare request form but could not recall which officer he asked. *Id.* at 53. His testimony therefore does not establish that Officer Cross, Officer Crockett, or Lt. Smith-Robinson heard a request, knew of his symptoms, or otherwise knew he faced a serious medical risk. Because deliberate indifference requires personal knowledge and conscious disregard, the record does not support liability against those defendants.

Case Worker Mayes, Sgt. Walton, and Lt. Koen responded more directly to Gregory's requests, but their responses do not permit a finding of deliberate indifference. During the evacuation, Gregory told Case Worker Mayes that his chest hurt and he could not breathe, and she directed him to proceed to the recreation yard. ECF 117-1 at 45-46. It is obvious that this was an emergency situation. There had been a fire in the prison, and Case Worker Mayes had a lot of balls in the air while she worked to move the prisoners to a safe location in an orderly fashion. As the inmates were being returned to their cells, Gregory told Sgt. Walton that he could not breathe, had soot in

his nose, experienced chest pain, and felt lightheaded; she responded that she was busy while staff worked to account for the inmates and secure the building. *Id.* at 50; ECF 90 at 11. Gregory likewise told Lt. Koen that he could not breathe and felt lightheaded, and Lt. Koen directed him to return to his cell. ECF 117-1 at 52-53. In context, these responses deferred Gregory's request while staff completed the evacuation, count, and securing of the inmates; they did not foreclose treatment.

More generally, the Eighth Amendment did not require the incident defendants to abandon their responsibilities during the fire response to personally secure immediate medical treatment each time Gregory requested assistance. Staff had a procedure under which inmates experiencing a medical emergency were taken directly to the medical unit, while other inmates requesting care were first secured in their cells and then triaged so treatment could be coordinated with medical staff. ECF 117-5 at 3; ECF 117-6 at 2. Gregory was able to walk down the stairs and proceed with the other inmates to the recreation yard, and there is no evidence that he outwardly appeared to require emergency intervention. ECF 117-1 at 28-29, 45-53. The incident defendants did not act with deliberate indifference by continuing the evacuation, count, and securing of ACH and directing Gregory through the procedure established to address non-emergency medical requests. See *Hayes v. Zatecky*, No. 1:21-CV-00630-JPH-KMB, 2023 WL 5722673, at *5 (S.D. Ind. Sept. 5, 2023) (administrators were not required to personally secure treatment for non-emergency complaints where the inmate could seek treatment through appropriate medical channels) (*citing Burks v. Raemisch*, 555 F.3d 592,

595 (7th Cir. 2009)); *Robertson v. Liedtke*, No. 3:23-CV-514-HAB, 2026 WL 274603, at *4-5 (N.D. Ind. Feb. 2, 2026).

Gregory's later failure to receive medical treatment does not show that any incident defendant deliberately blocked his access to care. Once Gregory was back in his cell, he asked an unidentified officer for a healthcare request form but could not recall which officer he asked. ECF 117-1 at 53. He could not recall whether he requested medical assistance at any later time, and the record does not establish whether he ultimately received treatment for symptoms related to the fire. *Id.* at 90. The fact that Gregory may not have received treatment could show that a breakdown occurred somewhere in the post-fire process, but it does not identify any incident defendant as responsible for the breakdown or permit a reasonable inference that the failure resulted from deliberate indifference. See *Barghouti v. Hansen*, No. 24-2610, 2026 WL 2169044, at *3 (7th Cir. July 28, 2026) (a subsequent delay in treatment did not establish who was responsible for the breakdown or that it resulted from deliberate indifference).

Lastly, to the extent Gregory's claim rests on a delay or failure to obtain treatment, he has not produced medical evidence bolstering his claim that the lack of earlier care caused him additional harm. *See Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 833 (7th Cir. 2026) (when a plaintiff alleges delayed treatment, he must present verifying medical evidence that the delay, rather than the underlying condition, caused harm). It is unclear whether Gregory ever received treatment for symptoms related to the fire, but there is no medical evidence that earlier evaluation would have

prevented additional injury or otherwise changed his medical outcome. See *Barnes*, 177 F.4th at 833; *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009).

Accordingly, even crediting Gregory's testimony that he repeatedly requested medical attention, the evidence simply does not permit a reasonable jury to find that any incident defendant consciously disregarded a known, serious medical risk. Summary judgment is therefore warranted in favor of the incident defendants on this claim.[1]

*b. Supervisory Defendants*

Gregory is proceeding against the supervisory defendants on a deliberate-indifference claim based on the risk of harm posed by the January 14 fire. There is no evidence that any of these defendants were present for or personally involved in responding to the January 14 fire. Rather, Gregory's claim concerns their conduct before the fire: he contends that they knew conditions in ACH created a substantial risk of serious harm in the event of a fire but failed to take reasonable measures to address that risk.

The supervisory defendants submit affidavits from ISP Safety Hazard Manager Taylor and Warden Neal describing the fire-prevention and response measures in place at ISP at the time of the January 14 fire. They attest to the following facts:

ISP maintains its own on-site inmate fire department, whose members receive statewide firefighter certification and training through the State Fire Marshal, allowing

[1] Because the record does not permit a reasonable jury to find the incident defendants liable for deliberate indifference, I do not reach their alternative arguments that Gregory did not have an objectively serious medical need or that they are entitled to qualified immunity.

the facility to respond to fires more quickly than if it had to wait for an outside fire department. ECF 117-7 at 2. ISP also equips its fire department with the latest firefighting and smoke-control equipment, including foam backpack fire-suppression systems and smoke-evacuation systems. *Id.* All fire alarms were operational at the time of the January 14 fire, several had been newly installed or refurbished, and the dampers and exhaust systems in the cellhouses were regularly repaired and replaced as needed to ensure they remained operational. *Id.*

ISP had also implemented additional fire-safety measures following a 2017 fire. It purchased additional water and ABC fire extinguishers, which were placed at officers' stations and on the endcaps of each cell range; reduced the amount of property inmates could keep in their cells; and replaced plastic property boxes with more fire-resistant steel boxes. ECF 117-7 at 2-3. The housing units themselves are primarily constructed of steel and concrete, and ISP uses fire-retardant mattresses. *Id.* at 4. In 2019, ISP also upgraded all of its fire hydrants. *Id.*

These measures were supplemented by regular inspection, training, and emergency-planning procedures. The ISP Fire Department conducted bimonthly inspections of all fire extinguishers, and there were no reports of inoperable or empty extinguishers in ACH leading up to the January 14 fire. ECF 117-7 at 4; ECF 117-8 at 2. The Safety Hazard Manager and ISP Fire Department also conducted four fire drills per year for each building. *Id.* Finally, ISP maintained a Fire Plan setting out staff procedures for fire prevention and evacuation, and all staff received training on the

plan and were required to complete a questionnaire testing their knowledge of those procedures. ECF 117-7 at 4-5; ECF 117-8 at 2.

All supervisory defendants attest they were unaware of any infrastructural issues or conditions at ISP that created a fire risk or threatened the lives of inmates living in ACH. ECF 117-2 at 1; ECF 117-7 at 6; ECF 117-8 at 4; ECF 117-9 at 3; ECF 117-10 at 2. The January 14 fire was investigated by both the State Fire Marshal and ISP's Internal Affairs Division, and neither party was able to determine the cause of the fire. ECF 117-7 at 7.

In his response, Gregory lists twenty-five conditions he contends made ACH unsafe and created a substantial risk of harm in the event of a fire: (1) no inmate firefighters were housed in ACH; (2) fire signals were not called promptly; (3) staff did not promptly release inmate firefighters to respond to fires; (4) electrical outlets were not grounded; (5) the smoke-ventilation exhaust system was inoperable; (6) fire extinguishers were either inoperable or insufficient in number; (7) staff were inadequately trained; (8) automatic smoke alarms were inoperable; (9) the paint was flammable; (10) staff training was deficient; (11) cells lacked emergency call buttons; (12) staff did not perform timely security checks; (13) cells had double-locking manual doors; (14) most fire extinguishers were water-based rather than ABC extinguishers; (15) staff cheated on fire-preparation questionnaires; (16) staff conducted sham fire drills; (17) there was no automated fire-suppression system; (18) the smoke-ventilation exhaust systems were not operational; (19) smoke detectors were positioned too high; (20) there were widespread problems with electrical outlets; (21) too few fire drills were

conducted; (22) inmates were not provided storage containers with lids or covers; (23) staff failed to comply with recommendations made after the 2017 fire; (24) fire-safety equipment was not meaningfully inspected; and (25) staff were not properly questioned regarding their knowledge of fire-safety procedures. ECF 136 at 22-23.

In support of these arguments, Gregory states that he "has provided a panoply of evidence," yet only has citations for four of the listed conditions. *Id.* And those sparse citations are largely lacking or even contradict his assertions. For example, for his contention that there was no operational smoke ventilation exhaust system, he cites *Jenkins v. Bass*, 2025 WL 1916106 (N.D. Ind. July 10, 2025), *reconsideration denied*, 2025 WL 2982380 (N.D. Ind. Oct. 23, 2025). He states that *Jenkins*, which was also about a fire in the prison, made the supervisory defendants aware that the exhaust system was inoperable. ECF 145-1, 23. But that is not what *Jenkins* stated. *Jenkins,* 2025 WL 1916106 at *4. Much the opposite, the opinion granting summary judgment stated that the smoke was cleared "*using exhaust fans* and other fans brought to the unit." *Id.* at *2. At the summary judgment stage, I may disregard unsupported factual contentions and need not scour the record for any possible evidence that might be relevant to the plaintiff's contentions here. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) (holding that a court need not "scour the record in search of evidence to defeat a motion for summary judgment.").

Regardless, the question is not whether ISP could have done more; it is whether the supervisory defendants were deliberately indifferent to a substantial risk of serious harm. Deliberate indifference requires more than negligence or even objective

recklessness. *Stockton*, 44 F.4th at 615. An official who takes reasonable measures to address a known risk is not deliberately indifferent merely because additional precautions were available or the measures taken ultimately proved insufficient. *See Farmer*, 511 U.S. at 844 (an official who responds reasonably to a known substantial risk cannot be held liable under the Eighth Amendment even if the harm is not ultimately averted); *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (an official is not liable where the measures taken were "reasonably calculated" to address the risk, even though they ultimately failed to prevent the injury); *Bagola v. Kindt*, 131 F.3d 632, 647-48 (7th Cir. 1997) (officials who took reasonable steps to prevent harm were not deliberately indifferent even though they may have acted negligently or failed to eliminate the risk as quickly as possible). Thus, Gregory cannot establish deliberate indifference simply by identifying additional fire-safety measures that ISP could have implemented.

Here, the undisputed evidence shows that the supervisory defendants took numerous steps "reasonably calculated" to address the risk posed by a fire. *See id.* Before the January 14 fire, ISP had: (1) established an on-site inmate fire department whose members received statewide firefighter certification; (2) repaired and replaced dampers, exhaust systems, fire alarms, and fire extinguishers as needed; (3) purchased updated firefighting equipment, including foam backpack fire-suppression systems and smoke-evacuation systems; (4) purchased additional water and ABC fire extinguishers; (5) reduced the amount of property inmates could keep in their cells; (6) replaced plastic property boxes with more fire-resistant steel boxes; (7) upgraded its fire hydrants; (8)

regularly inspected its fire extinguishers; (9) conducted fire drills four times per year; (10) implemented a Fire Plan governing fire prevention and evacuation; and (11) trained and tested staff on that plan.

Gregory lists various ways in which he believes these precautions were inadequate or could have been implemented more effectively. But as I noted above, the Eighth Amendment did not require the supervisory defendants to eliminate every conceivable fire hazard or adopt every additional precaution that might have reduced the risk further. The undisputed evidence instead shows a substantial system of fire prevention, firefighting, evacuation, inspection, and training measures directed at the very risk Gregory contends the defendants ignored. That those measures did not prevent his exposure to smoke during the January 14 fire does not permit a reasonable jury to conclude that the supervisory defendants exhibited "a total unconcern" for his safety. Summary judgment is therefore warranted in favor of the supervisory defendants on this claim.

Accordingly, for these reasons, summary judgment is warranted in favor of all state defendants on both of Gregory's claims.

**II. Dr. Chico**

Gregory is proceeding against Dr. Chico on an Eighth Amendment claim that she was deliberately indifferent to his need for medical care following the January 14 fire. ECF 9 at 11. Dr. Chico moves for summary judgment, arguing that the evidence does not permit a reasonable jury to find that she was deliberately indifferent to any serious medical need. ECF 119; ECF 122.

Dr. Chico provides an affidavit in which she attests to the following facts: During all relevant times, Dr. Chico worked at ISP as a psychologist providing mental health services to inmates. ECF 120-1 at 1. She was not scheduled to work on January 14, 2023, but was called after the fire in ACH and asked to come to the prison to check on the inmates' mental health. *Id.* at 2. By the time she arrived, the fire had been extinguished. *Id.* Dr. Chico spent the next four or five hours walking each range of ACH and checking on each inmate, including Gregory. *Id.* She reminded inmates that she was available for mental health counseling, and several inmates who requested follow-up mental health treatment were scheduled for appointments. *Id.*

Because Dr. Chico is a psychologist rather than a medical doctor, she did not evaluate inmates for specific medical treatment during these rounds. ECF 120-1 at 2. If an inmate requested medical care, however, Dr. Chico attests that she recorded the inmate's cell location on a list and provided the list to custody staff so the inmate could be taken to the medical unit. *Id.* at 2-3. She did not have authority to personally escort inmates to the medical unit. *Id.* at 3. Dr. Chico does not specifically recall whether Gregory requested medical care when she spoke with him, but she attests that, if he did, she would have included his cell location on the list provided to custody staff. *Id.* She further attests that she observed no inmate displaying obvious signs of a medical emergency and believed that inmates who requested treatment would be taken to the medical unit. *Id.* After completing her rounds and providing her list of cell locations to custody staff, Dr. Chico left the prison. *Id.*

In his response, Gregory states that, when Dr. Chico came by his cell, he informed her of his symptoms and requested medical care, and she responded that she was a mental health professional and was not responsible for his healthcare. ECF 130-1 at 3. He asserts he was not taken to the medical unit despite reporting these symptoms, and argues Dr. Chico was therefore deliberately indifferent for several reasons.

Gregory first argues that Dr. Chico acted with deliberate indifference by providing the list of inmates requesting medical attention to custody staff rather than directly to medical staff. ECF 130-1 at 9-10. That conduct does not permit a reasonable inference of deliberate indifference. Dr. Chico attests that she provided the list to custody staff so that those inmates could be taken to the medical unit for evaluation. Even if Gregory believes it would have been preferable for Dr. Chico to communicate directly with medical staff, the Eighth Amendment did not require her to personally undertake every step necessary to secure treatment where she reasonably referred the matter to other prison employees responsible for arranging access to the medical unit. *See Burks*, 555 F.3d at 595 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). Providing Gregory's request for medical attention to custody staff so that they could arrange for him to be seen by medical personnel therefore does not exhibit "a total unconcern" for his welfare.

Next, Gregory argues that Dr. Chico "failed to notify medical staff (or any other staff for that matter) of my need for medical attention, and instead rushed back home to continue enjoying her day off and entertaining her house guests." ECF 130-1 at 3. Dr. Chico, however, attests that "[a]ll offender requests for medical treatment that were

made to me were recorded and delivered to custody staff." ECF 120-1 at 3. Gregory has no personal knowledge of what Dr. Chico did after leaving his cell and therefore cannot contradict her testimony based on his own observations. He nevertheless argues that the circumstantial evidence creates a genuine dispute as to whether Dr. Chico actually provided the list of inmates requesting medical attention to custody staff. ECF 130-1 at 10-11. He relies on two grounds.

First, Gregory argues that the incident defendants' attestations that they were unaware of his request for medical attention create a factual dispute as to whether Dr. Chico ever provided the list of cell locations to custody staff. *Id*. But Dr. Chico does not identify which member of custody staff received the list, and there is no evidence that she provided, or was expected to provide, the list to any of the incident defendants specifically. The fact that those defendants were unaware of Gregory's request therefore does not contradict Dr. Chico's testimony that she provided the list to custody staff; she could have provided it to another custody employee who is not a defendant in this case.

Second, Gregory argues that the fact that custody staff did not ultimately send him for medical treatment creates a genuine dispute as to whether Dr. Chico actually provided the list of cell locations to custody staff. Similar arguments were recently addressed by the Seventh Circuit in *Taylor v. Reagle*, No. 25-2338, 2026 WL 1951623 (7th Cir. July 6, 2026), and *Barghouti v. Hansen*, No. 24-2610, 2026 WL 2169044 (7th Cir. July 28, 2026). Although both are nonprecedential dispositions, they are persuasive because they address similar attempts to infer from a plaintiff's subsequent failure to receive treatment that a defendant never relayed his request for medical assistance.

In *Taylor*, the district court determined that defendant Sergeant Williams was not deliberately indifferent to Taylor's serious medical need after crediting Sgt. Williams's testimony that he telephoned medical staff and relayed Taylor's complaints. On appeal, Taylor argued that Sgt. Williams's testimony was contradicted by Taylor's own sworn statements and the absence of an entry documenting the call in the relevant logbook. The Seventh Circuit affirmed, concluding that "neither Taylor's statements nor the lack of entry in the logbook create a genuine dispute of fact." *Id.* at *2. Because Taylor lacked personal knowledge of whether Sgt. Williams contacted medical staff, he could not genuinely dispute Sgt. Williams's sworn testimony that he had done so. *Id.* (citing *Payne*, 337 F.3d at 772). Nor did the absence of a logbook entry, "without more," permit a reasonable inference that the call never occurred. *Id.* (*citing Estate of Biegert ex rel. Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020)).

Similarly, in *Barghouti*, the plaintiff argued that correctional officers had lied when they testified that they contacted medical staff about his complaints. 2026 WL 2169044, at *3. The Seventh Circuit rejected that argument because there was no record evidence contradicting the officers' accounts, explaining that "[m]ere speculation cannot defeat a motion for summary judgment." *Id.* Although the court expressed concern that Barghouti had waited as long as a day and a half for medical attention, that delay did not establish that the officers had failed to contact medical staff because "the record does not indicate why the delay occurred or who was responsible, much less whether the delay was the result of deliberate indifference." *Id.; see also Walker v. Wexford Health*

*Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("[T]he plaintiff must show that the defendant's actions or inaction caused the delay in his treatment.").

The same reasoning applies here. Gregory has no personal knowledge of what Dr. Chico did after leaving his cell and relies on the fact that he was not subsequently taken to the medical unit to infer that she must not have delivered the list to custody staff. But the fact that Gregory ultimately did not receive medical attention on the day of the fire does not reveal where the process broke down, much less permit a reasonable jury to attribute that failure to Dr. Chico. *See Barghouti*, 2026 WL 2169044, at *3; *Walker*, 940 F.3d at 964. There is no evidence contradicting Dr. Chico's sworn testimony that she recorded all requests for medical treatment and delivered them to custody staff. On this record, concluding that she failed to do so merely because Gregory was not ultimately taken to the medical unit would rest on speculation rather than a reasonable inference from the evidence. *See Taylor*, 2026 WL 1951623, at *2; *Biegert*, 968 F.3d at 701; *Payne*, 337 F.3d at 772.

Moreover, even if a reasonable jury could infer that Dr. Chico failed to include Gregory's cell location on the list or failed to provide the list to custody staff, there is no evidence that any such omission amounted to deliberate indifference rather than negligence. Nothing in the record suggests that Dr. Chico intentionally withheld Gregory's request, deliberately omitted him from the list, or otherwise consciously chose to prevent him from receiving medical care. Thus, even assuming some breakdown attributable to Dr. Chico occurred, the record would permit only speculation as to whether it was inadvertent or reflected the culpable state of mind

required for an Eighth Amendment violation. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc); *Farmer*, 511 U.S. at 836-38.

Third, the lack of evidence that any delay harmed Gregory provides an additional reason his claim cannot proceed. When a claim rests on delayed rather than denied treatment, the plaintiff must present verifying medical evidence that the delay itself caused additional harm. *See Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 833 (7th Cir. 2026). Gregory has produced no medical evidence that earlier evaluation would have alleviated his symptoms sooner, prevented additional injury, or otherwise changed his medical outcome. See *Barnes*, 177 F.4th at 833; *Knight*, 590 F.3d at 466.

Accordingly, even accepting Gregory's testimony that he asked Dr. Chico to arrange medical attention, there is no nonspeculative evidence that she consciously disregarded that need or caused a harmful delay in treatment. The only competent evidence addressing what she did after speaking with the inmates shows that she recorded requests for medical care and provided the resulting list to custody staff, and Gregory has produced no evidence from which a reasonable jury could find either that she failed to do so in his case or, even if she did, that the omission was anything more than negligent. Summary judgment is therefore warranted in Dr. Chico's favor.

For these reasons, the court:

(1) GRANTS the state defendants' motion for summary judgment (ECF 116);

(2) GRANTS Dr. Chico's motion for summary judgment (ECF 119); and

(3) DIRECTS the clerk to enter judgment in favor of the defendants and against Damond Gregory, and to close this case.

**SO ORDERED**.

ENTERED: September 23, 2026.

/s/Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT